## Case No. 12,247.

SALDERONDO v. The NOSTRA SIGNORA DEL CAMINO et al.

[Bee, 43.] [1]

District Court, D. South Carolina. Sept. 8, 1794.

TREATIES—PRIVATEER'S COMMISSION—NEUTRALITY LAWS—ALTERATIONS.

1. The courts of the United States cannot question the validity of the commission of a French privateer, whose prize is brought into our ports, by virtue of the 17th article of our treaty with France [8 Stat. 186].

2. What alterations in the equipment of such privateer will amount to a breach of neutrality.

[This was a libel by Don Josiah Ramon De Salderondo against the ship Nostra Signora del Camino and Hervieux and others.]

BEE, District Judge. It appears from the pleadings and evidence produced in this cause that this ship, the property of Spanish subjects, sailed from Cuba in May last, with a valuable cargo, bound to Spain. That on the 23d May she was captured on the high seas by the armed schooner Minerva, commanded by Hervieux, who put a prize-master and crew on board, and ordered her for Charleston. That two days after the Sans-pareille privateer joined them at sea, and also sent some men on board. That on the arrival of the prize at Charleston, she was entered at the customhouse as prize to the Sans-pareille: and that the cargo has been sold to several persons. It appeared in evidence that the Minerva was a French bottom, built at St. Domingo, and fitted out in the year 1792, to act against the brigands in that island. That on the breaking out of war she was the first vessel equipped and commissioned to cruize against the enemies of the French republic, and that she made

some prizes. That when the British took Jeremie in 1793, this schooner was in the harbour, and was carried off by seven Frenchmen who passed the forts, notwithstanding they were fired upon. That she was soon after taken and carried to Jamaica, from whence she sailed again as an English privateer to cruize against the French. That she was then captured by the Atalanta, a French privateer, and sent to this port as prize. That she remained here from the month of January, till May, when she sailed from this port, and was reported at the customhouse as prize, both at coming in, and going out. It appeared that she had eight guns and eight swivels mounted, and two guns and two swivels in the hold; and that she was pierced for twelve guns. That she had also on board several boxes of arms at the time she was taken by the Atalanta, and that she had been furnished with new sails at Jamaica. The collector proved that she was reported and entered at the customhouse as having ten guns. That she went out with that number, and was not armed or equipped here. No proof was offered of her having any other commission than that under which she sailed before she was taken by the British. Two witnesses proved that she had received repairs in this port. Her quarterdeck was cut down, and maindeck laid flush, and four new swivel stocks were put up. She had a new foremast, sweeps, and new spars fore and aft, and some new sails. She was also furnished with ringbolts, bolts, iron stanchions, and an iron tiller. Five exhibits were filed, but are inadmissible, except the copy of the Sans-pareille's commission. Indeed, after the rejection of many of the same nature, not coming within either the letter or the spirit of the consular convention with France, I was rather surprised to find these introduced. In future, that the proceedings may not be too voluminous, I shall consider such exhibits on their first production, and admit or repel them then.

It was contended for the actor that all fitments for war in the ports of a neutral nation are illegal. That the law of nations protects Spain in this respect, though we have no treaty with her. That capture by a vessel having no commission, is unlawful: and prizes so taken, if brought into a neutral port, must be restored. That no change of property can take place before condemnation by some authorized tribunal; and that as the Minerva was made an English vessel by capture and condemnation, her original French character could only be restored in the same way. That by the marine law of France, certain regulations must be complied with before a commission to cruize will be granted; and that these regulations were not observed in this instance. That as Hervieux had no commission, he could have no right, and could transfer none to the captain of the Sans-pareille. That as no jus post-liminii could apply to the vessel, after condemna-

[1] [Reported by Hon. Thomas Bee, District Judge.]

tion, neither could it renew the efficacy of the commission. That, even if the original commission could have survived, it must inure to the original possessor, and not to Hervieux. Moll. de J. Mar. pp. 9, 41, was quoted to shew a distinction between prizes made by public ships of war, and such as are made by privateers, and letters of marque; which last, if brought into a neutral port, before condemnation, must be given up. And it was added that, by more modern authorities, even public ships of war were subject to the same law. That though the 17th article of the treaty between the United States and France [8 Stat. 186] allows a temporary asylum, yet as no condemnation has taken place, and the property been sold here, the original owners may recover it.

The claimants, in support of their plea to the jurisdiction, rely on the 17th article abovementioned, as conclusive. They admit that by the general law of nations, property captured and brought into neutral ports may be delivered to the original owner; but they contend that the treaty alone must decide this case. That this treaty is the supreme law of the land, and takes away all jurisdiction from this court.

It was also conceded that the court could grant redress in the following circumstances: (1) Where American citizens capture the property of a nation, as the Dutch, with whom we have a treaty to the contrary. Such was the case of Talbot v. Janson [3 Dall. (3 U. S.) 133]. (2) Where French citizens capture American property, and bring the same infra praesidia of the courts of the United States. (3) Where the capture is made within neutral limits. (4) Where the capturing vessel has been equipped in our ports, contrary to the rights and duties of neutrality.

It is contended, however, that the present case does not come within either of these classes. That the citizens of France may rightfully capture the vessels of her enemies, with or without a commission, so far as concerns neutrals. That, in this case, the property having been sold, and passed into the hands of a third person, the spes recuperandi is gone. That the repairs made to the Minerva in our port were lawful, and that all the powers at war were privileged to the same extent. That the act of congress of 5th June, 1794, had settled the limits of jurisdiction in this court, and that they did not comprehend the present case. From this view of the evidence and arguments it is clear that the interference of this court can only be justified by such equipment of the privateer in this port as contravened the laws of neutrality.

All the cases, from Molloy, Vattel, Bynkershoek and others, relative to delivery up of prizes brought into neutral ports before condemnation, are superseded by our treaty with France. This has altered the general law of nations quoad the parties thereto, and all independent nations have a right to do this. Authorities to support the position are too common to need enumeration. Great stress was laid on the marine law of France, as containing indispensable regulations without due attention to which no lawful prize could be made. This might have weight before French tribunals on a question of right between the uncommissioned captor and his sovereign; and the lex loci might well apply. All the civil law writers admit that the prize might be made for the benefit of the sovereign; and it has been doubted whether the nation suffering by such unauthorized capture might punish the captor for piracy, if he should fall into their hands. But it never was supposed that a neutral nation could do this.

It must also be conceded that a distinction was formerly taken between national and private ships of war, as to the restitution of prizes brought into a neutral port. But this difference is no longer made; and the whole matter seems finally settled by modern decisions, particularly by the case in 4 Durn. & E. [4 Term R.] 386, 387 [Lord Camden v. Home], which must enforce conviction wherever it is read. In the case of Talbot v. Janson, 3 Dall. [3 U. S.] 133, the prize was restored because our treaty with Holland had been violated. No such thing is pretended now. This vessel has been proved to have been originally French, and this court will not inquire into the circumstances of her capture by the British, and subsequent recapture by a vessel of her own nation. She came into our ports armed and equipped for war; and the alterations and repairs made during her stay here did not amount to an infringement of our neutral rights. The fixing of four new stocks for swivels, and procuring two carriages for the guns in her hold might have brought her within the act of the 5th June; but she had sailed previously to the passing of that act. The president's instructions permitted such alterations and additions, even if doubtful in their nature, as regarded defence or war; and all the belligerents were entitled to the same privilege.

Upon the whole, I consider the 17th article of our treaty with France as conclusive against the jurisdiction of this court, and I dismiss the libel with costs.

---

SALE (PENNINGTON v.). See Case No. 10,-939.

SALEM (WYTHE v.). See Case No. 18,121.

SALEM FLOURING MILLS CO. (OLIPHANT v.). See Case No. 10,486.